Alright, the next case is Municipal Association of SC v. USAA General and Mr. Jordan is going to argue first. May it please the Court, Your Honor, Robert Jordan, I and my co-counsel collectively represent the appellant insurers in this matter. The issue before the Court today is whether or not the Municipal Association of SC of China, on behalf of its members, can assess against these insurers a tax, a municipal tax, measured by the percentage of flood premiums they collect as administrators under the National Flood Insurance Program, which is run by FEMA. We contend the tax is not owed, one, because it's preempted by federal law, and two, it's barred by the sovereign immunity doctrine. The basis for our protest is grounded in the legislative history of the National Flood Insurance Act as well as the regulatory scheme that runs the program, often referred to as the arrangement. Both sides have provided the Court with a pretty thorough history of the program and the act as well as the regulatory scheme. Likewise, this Court has looked at this program before. In 2010, in Columbia Venture, you looked at it. In 2007, in Studio Frames, you looked at it. And in those cases, you provide a very thorough history of the program. The history of the program is important to our analysis, but rather than spend all my time going through it, what I'd like to do is just highlight a couple of the key points from not only the act itself but the regulatory scheme, which we think directly impact not only the preemption analysis but also the sovereign immunity analysis. Starting with the National Flood Insurance Act itself, it was passed in 1968. It's stated in the preamble that one of its primary purposes is to reduce pressure on the fiscal treasury from responding to flood disasters. There were large swaths of the country where there were high-risk areas where private insurers would not sell insurance because the premiums were simply too high for people to buy them. Faced with ever-increasing expenses to respond to flood disasters, the federal government, through Congress, obviously passed the National Flood Insurance Act. Again, one of the primary goals was to reduce the cost of responding to flood disaster. The idea was if we have an insurance pool, even though it's going to be subsidized by the federal government, we will lose less money with subsidized insurance than we would if no program existed at all. Another important part about the act for purposes of our argument is the government is the only insurer here. It pays all claims. It pays all administrative expenses. It is a government-run program. The program has never been actuarially sound. This court has noted that in some of its opinions like studio frames. It runs at a loss. Most recently, unfortunately, we saw that last month when Congress had to— They broke the bank at $9.8 billion. Excuse me, not million, billion. And those were directly to pay flood claims. More recently, I think there was a $50 billion that was not involving this program. But FEMA was short $9.8 billion, so it had to draw on its line of treasury, and Congress had to have emergency authorization. That's an example of how not only is this a federal program, but the federal government is responsible for all claims. As the court is probably aware, there are two frameworks that Congress in 1968 set out where this program can run. The first was Part A. From 68 to 78, it ran under Part A. That involved private pool of insurers who ran the program with government assistance. The government advised, the government encouraged, and the government subsidized both premiums and claims. But the pool of insurers ran it. In 78, then HUD had responsibility for the program. They filed a report with Congress, and it was converted to Part B. Part B, as this court has noted in, again, Columbia Venture and Studio Frames, is an all-federal program. What happened in Part A? Part A, the way the original act... It was not viable, or what? I think what happened, Your Honor, is there were disagreements between the government and the private insurers on how best to run it. And the government increasingly was butting heads with private insurers over its administration. So the way the act read, the secretary of HUD had to file a report with Congress demonstrating the reasons for converting. And that report indicated all these problems they were having with, I guess, ultimately, who makes calls. I think that was the... Is Part A moot now? Part A is moot. And since 1978, we've run under Part B. And from 78 to 83, we ran with all federal employees. And one point I want to make here is this is in the National Flood Insurance Act. Part B, Congress tells the director of FEMA that he can run the program, quote, through the facilities of the federal government, close quote, using either federal employees or insurance agents, quote, acting as fiscal agents of the United States. That is a unique designation I would submit to the court, and it defines the relationship between our clients, who are often called WIO insurers or write-your-own insurers, and the federal government. We are their fiscal agents simply administering a federal program. And it's important that you note in Part B that the director can use federal employees or use insurers to accomplish this goal. From 78 to 83, they actually use federal employees. And then in 83, I would submit, and this is not in the record, but seeing efficiencies through using private insurers, they develop the arrangement. The arrangement, as I noted earlier, is the regulatory scheme that runs this program. It's codified as in the Federal Registry. So if a private insurer wants to participate as a fiscal agent to help the federal government administer this program, it has to sign on to the arrangement and agree to be bound by its terms. A few points about the arrangement. It's federal law, as I noted. It's non-negotiable. Insurers don't have any bargaining power. They either accept its terms or they don't participate. FEMA has authority under the arrangement and through its regulations to issue all the rates, terms, and conditions that apply to the insurance. The policy forms are actually codified in the Federal Registry. And finally, I would note that there's a provision in the regulations that say that a WIO company must strictly adhere to all written guidance from FEMA regarding the program, and that's important, as I'll get to in a moment, in our case. Finally, the arrangement describes not only does it, again, reiterate that we are fiscal agents of the federal government when we carry out our WIO functions, but it describes our duties as fiduciary in nature. So, to the heart of our argument. As I noted, we have a tax that's issued by the municipalities that collects a percentage of the flood premiums we collect. Keep in mind, we pay this on all other lines of business. We don't dispute the validity of the tax as to life, health, and all other lines of insurance we sell. We only dispute it as to the flood. The regulation, the arrangement, expressly addresses this tax. We contend there's an express preemption clause in the arrangement. This is at 44 CFR 62 Appendix A, Article 3. It is the key regulation in this case before the court. Mr. Jordan, I take it if, counterfactually, the source of this exaction was state law directly. In other words, if the association went to the South Carolina legislature and said, look, we got this problem with these insurance companies making all this money, and we can't get any of it because of this federal regulation, what we need you to do is to tweak South Carolina law and turn it into a state tax. So, that would take care of their problem, wouldn't it? Well, I think if that tax somehow, I don't know how they would do this, they turn it into a state premium tax. The regulation says we have to pay state premium tax, and we do. But everything else remaining the same, you have a different case. I don't see that, but I don't understand how you can convert a municipal tax into a state premium tax. The legislature can do whatever it wants. It just collects the tax, the state tax, and then remits it to municipalities. Actually, that's my theory for internet tax, for sales tax. Pass a 5% national tax on internet sales and then remit all the proceeds to the states. Amazon sent me an email this week. I'm a little worried about it, but I think we'll save that for another day. But to your point, you've obviously read the regulation. It says a state premium tax. And think about the history, if you will, of this regulation. The final regulation that we're relying on is 97. It starts in 85 with the arrangement that says we're responsible as WIOs for all taxes. Then it gets amended, and it says, well, we're going to acknowledge that you have to pay state premium taxes as part of your expense allowance. So that's then added. By the way, there is no such thing in South Carolina, I take it. There is a state premium tax. There is a state premium tax. And we pay it. Okay, and you pay it. And we pay it. And so, yes, we are paying that. And then there's another amendment that goes through notice and comment that doesn't pass where they add this surcharge on flood premiums or guaranteed fund assessments. And then the final one, after notice and comment, is they add the other taxes and fees clause. Our contention, obviously, is that this tax, whatever name you apply to it, it is not a state premium tax. It has to be another tax or fee. The language is unambiguous, and we assert that it is expressly preempted. Moving on, we also obviously argue that there is conflict preemption. We have direct conflict. No matter what type of preemption, does it need a label? I don't think it does, Your Honor. Federal regulation says they can't collect the tax. We think the analysis ends with the regulation. And that is under the supremacy clause. That's it. Agreed. I guess we've argued in the alternative at the district court and before this court that we also have. There are a lot of theories in there. There are a lot of theories, Your Honor, and I think I can succinctly summarize the direct conflict and the obstacle. If I could just pick up on Judge Niemeyer's point, it's a very small point. Actually, the regulation doesn't say they can't collect. The regulation says you're not liable for, or you don't have to pay. I'm not suggesting that makes a difference, but it is interesting how, at least in my view of it, the preemption issue here is a little different than most preemption situations. For example, a state law requirement that a party do something that a federal law requirement requires the party to do something different. In other words, both requirements impose an affirmative act obligation. Here, what you have, if preemption applies, is sort of an immunity, right? An immunity from this tax. If your argument prevails on preemption. On preemption, well, I think it preempts the tax, Your Honor. I mean, I understand your point, and maybe we're worse, but to that point, I think you've— Actually, it may just fall in a little further on what Judge Davis is asking. If, as they claim, these are federal funds, they're being collected and remitted to the federal government with the allowance of the fees and so forth along the way. FEMA takes position that these are federal funds. Correct. And I don't know whether you can—a state can tax federal funds even without a preemption, can it? Is there some principle that— Without consent, I don't think it can, Your Honor. That's your sovereign immunity argument. Correct, and that's twofold. We also contend that we're an instrumentality, and that's why I spent time highlighting that we're fiscal agents, we're fiduciaries, and we essentially act as administrators. And I think that goes to the heart of the case, is that when we put on our WYO hat, we're carrying out the same job that the act says a federal employee can carry out, and it's separate from when we do our other lines of business, and that's an important distinction for sovereign immunity purposes. So, again, Your Honor, yes, as to express preemption, we think the regulation is controlling, it's unambiguous, and that's the answer. However, if you look at the obstacle preemption issue, we received a memo in May of 2008 from the FEMA director— excuse me, the director of the National Flood Insurance Program, who works for FEMA, expressly telling us that we were not to pay this tax from any source of funds. Okay? So we have a federal regulation telling us that we don't owe it, and understanding your comment that it doesn't say that in that term, but it certainly insulates us from paying it. We have the director of the program telling us we don't owe it. The director basically invokes this notion I just raised, and I just wanted to follow up on it. He does. He says it's federal money. Now, what principle makes federal money not taxable by states? Is it a sovereign immunity? It's a sovereign immunity. The government hasn't consented to that tax. The incidence of the tax falls on the federal government. We're simply a bailey who collects the premium and passes it along to the federal government. It's the federal government's money, and if it doesn't consent, it can't be taxed. But on the obstacle, I was also going to note that in the district court, the Department of Justice on behalf of FEMA filed a statement of interest, and they also reiterated that they don't think we owe the tax. So we've been told in three different forums by three different authorities from the federal government, we don't owe this tax. Of course, the municipality of South Carolina said we do. This is direct conflict preemption, and we submit that federal law trumps local law in that instance. I can imagine several answers, but do you want to share briefly why DOJ won't jump into this case? They're just sort of standing back, watching, see how it all shakes out. Perhaps off the record, Your Honor. I'm sorry? Perhaps off the record. I think that's all the answer we need. We also looked at Columbia Venture, which this court decided in 2010. That involved a no-interest rule. A DUG OIO was sued, and the plaintiff there tried to recover pre- or post-judgment interest. This court found that that cost of defending, excuse me, that cost would be an obstacle to the objective of the program, and I spent time at the outset explaining the objective of the program is to reduce the cost to the federal government of responding to flood tragedies, and the regulatory scheme that FEMA developed is eminently reasonable in carrying out that objective, and the regulation we're dealing with here directly goes to the cost that will be incurred in administrating the program. So in Columbia Ventures you found that we have an obstacle. Here we think we've got a clear obstacle. Whether it falls on us and we get reimbursed by FEMA or it goes directly to FEMA, it's going to be an obstacle and a cost. It's going to be borne by the program and its operating expenses. I see I'm almost out of time. Our final argument, and I've touched on the sovereign immunity, both that we are an instrumentality as a fiscal agent. It clearly falls on federal funds. This court found that these premiums are federal funds in studio frames. We finally argued under 19B that FEMA was an indispensable party, Judge Davis, so we made an effort to get them either in the case or the case dismissed and adjudicated in another forum. Do you have a preferred way to win this case? I don't, Your Honor. On Rule 19 versus? I will not be greedy. All right. Thank you. We'll hear Mr. Tyson. Thank you. Good morning, if it pleases the Court. My name is Rob Tyson, and I have my law partner, Bobby Stepp, and Roy Laney here today, and we represent the Municipal Association of South Carolina. We thank you for giving us the opportunity to come talk to you about this case. It is important. You raise very good questions, but this question boils down to can the South Carolina cities, do they have the authority under the South Carolina statute to impose a tax on companies doing business within their city limits? That's the question. These companies have paid taxes for many, many years. How about a federal bank account within your city? How about a, excuse me? A federal bank account. A federal bank account. Yeah. U.S. Attorneys has a bank account where they have proceeds of fees and so forth, and it's located in one of your municipalities. Could you tax that? Your Honor, that's a good question. I don't believe that. I think it's pretty obvious you can't. Well, that's right. I was going to say we can't. If they're federal dollars, then we're not making an argument about whether the cities have some additional authority beyond that to tax the federal dollars. What we're saying is these are not federal dollars. Well, in studio frame, we said these are federal dollars, and FEMA has said these are federal dollars. Well, I think, Your Honor. They pay the full risk. They collect the premium through the agents and pay the full risk and remit to the agents their costs in a profit, I guess. That's right. And what we say about studio frames is if you're going to get into that discussion about whether a claim should be paid, whether there's coverage on a claim. No, no. No, the question is whether the funds, the premiums, are federal funds. Yes, sir. FEMA says they are. They do say they are, and I'm not sure that we would argue with them on a claim that is filed within the policy, within the arrangement. Not a claim, a premium. Yes, sir. But the way that it works is the premiums are paid. They go to the federal government. A claim is then filed, and then the federal government pays that back. We're not arguing that those specific dollars that have been collected on those premiums are the federal dollars. That's what you're trying to tax, isn't it? No, sir. What we're trying to tax are the dollars that are being received by this company. The premiums are paid to the insurance companies, right? Correct. And the premiums are paid for flood insurance. Correct. Those premiums are claimed by FEMA to be federal funds. Yes, sir. I understand that. Do you think they're wrong? Yes, sir. We do. The distinction is that the tax that we're imposing No, no. Stick with the fund premiums. Okay. Are they federal funds? No, sir. We don't believe that. Why? The funds that are collected that go into that are federal funds for the purposes of the administration of that program. But there are plenty of dollars that are outside. This tax is outside of the arrangement. It's outside of the extra contractual, as it's called, in the arrangement. We don't believe that those dollars are such that FEMA then can claim those are federal dollars and shouldn't be paid. If you're going to tax premiums on federal flood insurance, why is that outside of the scheme? Your Honor, I guess the key on this, for us, is how we tax that. We're not necessarily taxing these premiums that are paid by Rob Tyson. You are. If you exclude them, they say they'll pay the tax on other insurance that they carry. The only thing they don't want to pay the tax on are the premiums for flood insurance. No, sir. I think they go even a little bit further than that. In their brief on page 16, they say the plain language of the current version provides that the only state or local taxes for which WI companies may be held liable pursuant to FEMA are these state premium taxes. So what they're saying is they're not going to pay property tax. They're not going to pay sales tax. They're not going to pay— It depends whether it's on a premium. Well, Your Honor, that's the measuring stick. I mean, the dollars, you've got to have a tax. It's got to be able—you don't have to have a tax. Let me say it differently. On the tax, it has to measure. There has to be a way to measure it, and that is the way this one is measured. If there was a tax on the— I'm sorry. Are you saying that if Harford owns a building in Charleston and part of the business done out of that building is flood insurance, that they're claiming they don't have to pay property taxes to the city of Charleston? The current version provides that the only, in bold and underlined, state or— I'm asking you, is that how the world is turning down in South Carolina these days? No, sir, that's not how we— Okay. I mean, they're paying their property taxes, right? I don't know that, Your Honor. Their brief says that if it— Wait, wait, wait. You represent the cities. I mean, you represent Charleston. You don't know what Charleston's getting from these insurance companies? Yes, sir. We believe they are paying those taxes. We believe they're paying that all— But I thought— Yes, sir, Your Honor. I'm sorry. I didn't— Okay. Maybe I wasn't clear. No, your question's very good. The only thing they're not paying are the 2 percent of the premiums paid under the flood program. That's the only thing they're not paying. Your Honor, that's what they say, though. Their argument is that they won't pay any other taxes. We don't know that. I'm just saying that if you take their legal argument, if you take the— That's the only tax you've levied on them, isn't it? Sir? That's the only tax you've levied. You know, we've got to get where we're communicating. This is not a trick or gotcha type of situation. The municipalities would like to collect a 2 percent on all premiums. Just as the state collects a tax on premiums. Yes. And it's a source of income. And as I understand the claim, the insurance companies simply want to exclude the premiums collected on flood insurance from the 2 percent. Now, if that's their only claim, do you have any objection to that? Yes, sir. The— Okay. Well, let's address that, then. Okay. What the arrangement specifically states—let me step back to this. It speaks to reimbursement of their expenses. So when they talk about they're paying this tax, and I think your question was, do they just pay the state premium tax? They pay that tax, but then they're getting reimbursed for those expenses. Okay? So in the language of the arrangement, it talks about the title of that— They're getting reimbursed by the federal government. That's right. At a stated rate. And in a good year, they get reimbursed more than they put out. And perhaps in a not-so-good year, they don't make a profit. That's right. Now, recently they've made a profit. They're doing okay, I guess. Yes, sir. They're doing very well. And that's the point of what—I guess I'm trying to— But if Sandy hits the coast of South Carolina and Myrtle Beach and Hilton Head and Charleston are left the way Brooklyn and the Queens and Manhattan were left, maybe they won't make so much money going forward. That's right. Yes, sir. I mean, there are all kinds of factors on how they operate their business, what else is going on, whether they had a lot of policies in those states or not. There are a lot of factors for that. The program is set up, though, that it was intended, as we know, that you'd pay your claims and that those claims that were collected, those would be the dollars on those premiums, those would be the ones who would be able to pay the claims. They have this line of credit in case of these catastrophes like Sandy that they can tap into. Unfortunately, when we have those huge storms and because of the government's— we've had a lot of those storms lately, the government's not been able to make that payment, thus they have to go back to Congress and do that. But our point is on the—he was talking about this preemption. I don't see that language in here, and that's what I was trying to get to. The language talks about it's a reimbursement for these expenses. There's no express preemption that says in Congress it doesn't say that, dear FEMA, you tell the companies they can't pay municipal business license taxes. It doesn't say municipal business license taxes here. It says all taxes other than the state premium tax. Yes, sir, it says excluding other taxes or fees such as that. So that's what it's talking about, whether it's going to get— those expenses are going to be reimbursed or not. It's not talking about an express prohibition against whether the cities have the statutory authority to impose that tax. They're trustees of the federal money, and they're sitting there saying, you collect this for us and remit it all to us, but you're not allowed to pay a tax on the federal money with respect to the 2 percent on the premiums. That's our money the federal government is saying. And I guess, Your Honor, the point is how far do you take that? Are they going to tell them not to pay— The federal government can do what it wants on that. They've decided they're going to allow FEMA to reimburse these guys for the state premium tax out of federal funds, but they're not going to reimburse any other taxes with respect to those premiums, out of those premiums. If you start with the 100 percent dollar amount, which is the premium, that theoretically is reduced by amounts allowed by the federal government to be paid to the insurance companies for various things. And one thing they're allowing the insurance companies to pay from that funds is a state premium tax. So it's a federal subsidy in that regard on the state premium tax, but they choose not to do it as a policy matter. Now, maybe you could persuade them otherwise, but as a policy matter not to pay the municipalities. And my guess is it's just going to be too expensive for them. Your Honor, I guess that, you know, just going back to it, I don't think that language— you know, our position is that that language doesn't have an express prohibition. There is no express preemption by Congress that's delegated to FEMA such that they say do not pay those taxes. Okay, what this section talks about is what taxes are going to be reimbursed, what expenses are going to be reimbursed. We don't think FEMA has the authority to tell a company— Well, then let's address it a different way. If that's the way it's read and the language is in the passive, shall not be liable, the company shall not be liable, then how do you address the proposition that the federal government takes a position, and we did in our earlier cases, that those premiums collected under the program are federal funds? They don't need to preempt that. And they're just, in that regulation, they're just telling the companies how they may spend the federal funds. Yes, sir, again, I guess our distinction is going to be on that, on whether they're federal funds. The studio frames opinion, for example. It says in the very first sentence, this appeal involves contractual and statutory coverage issues under a standard flood insurance policy issued pursuant to the National Flood Insurance Program. So for those type claims, for claims, for programs that are administered under this program, then I don't have any argument with you on that. Did you say you dispute the fact that these premiums are federal funds? Did I? I'm sorry, sir. Do you dispute the claim of FEMA that these premiums— FEMA makes a claim that these premiums collected for federal flood insurance are federal funds, and that the insurance companies are trustees of those funds. That's right. Do you disagree with that? I think the answer is yes, I do. And why do you do that? Part of that is they get the money back. Some of the money they get of the premiums, the insurance companies, before it even goes to the government, they get the 30 percent cut or whatever the allowance is. It goes under the privilege of the federal government. The federal government claims that premium. They're the full risk taker. And they collect a premium. They have the forms. They manage the whole program. And they find it efficient through the insurance companies. Yes, sir. I guess I don't believe that. Whose funds are those? I think that once they arrive at FEMA, then yes, sir, they would be the federal dollars. So that an agent collecting funds on behalf of a principal, those funds don't belong to the principal until the agent remits them to the principal? Well, Your Honor, that's the whole purpose of this program, is that they're trying to have the premium. My question is if an agent collects funds on behalf of a principal, are the funds not the principal's from the beginning they're collected? You're suggesting that they're not FEMA's funds until they're paid to FEMA. Yes, sir. I understand your question. I guess, though, that my answer would be, again, that the distinction is going to be made such that when the principal receives those dollars, until they move to FEMA, then FEMA can't claim how the company uses those dollars. I mean, there are all kinds of ways they can do it. FEMA, you know, our position on this is FEMA can't tell the insurance company whether to pay a light bill. It can't tell what expenses should be, which should be paid or shouldn't be paid, that don't involve the flood insurance program. I mean, what we're talking about... You're absolutely right, but the premiums here we're talking about are only premiums on federal flood insurance. That is underwritten by the federal government with federal funds. And the premiums are collected, and the federal government tells the insurance companies what they can keep and what they have to pass on. And the argument would be, and that's what FEMA is saying in the letter explaining to the state, is that those funds are not private funds, they're federal funds. Yes, sir. And the city can't tax them. I guess the distinction, again, is I was just looking for the FEMA language in the letter. I mean, what it's talking about, it specifically says that this is in their letter on... It's in the record on the appendix, page 147 of the letter. In the second paragraph, it says that their arrangement provides for the payment of state premium taxes by the companies and reimbursement by FEMA for such expenses, but specifically excludes reimbursement for these other taxes and fees. So I think if you read that language in the statute, it must be read such that anything that's within the program, anything that deals with these expenses, then that's what that section deals with. There's no suggestion here, is there, that the cities don't have access to whatever audited statements or other documentation so that the insurers, they're not playing games with the city. In other words, the city is getting the 2% on the non-flood premiums, correct? Correct. Okay. So there's no question this is not a situation where the insurers are saying, well, we only made $8 million on the flood premiums, but actually they made $10 million. The city's not being cheated out of anything that is not covered by the FEMA directive, as far as you know. Well, if they're not able to pay the tax, then the city's going to be cheated for the amount of... No, I'm just saying... Yes. But if FEMA says it's our money, then as Judge Niemeyer has said to you several times now, if it's federal money, you don't have any entitlement to it. Yeah, I guess... Absent consent. The only thing, the point that I'd say to that, Your Honor, is that FEMA's not getting any more money. This isn't about whether FEMA's going to be made... But let's start with this proposition. You left out two important sentences in this letter. The first sentence is, And then the sentence that follows, the one that you quote, What they're basically doing is they're authorizing federal monies to be paid by the insurance companies for state premium taxes out of federal funds. But they're not authorizing it to be paid for any other taxes. And their argument is pretty clear, that they consider these premiums federal funds, and 2% being levied on those premiums is taxing federal funds. Now, I sort of lose track of your argument. Your argument somehow is because FEMA reimburses the insurance companies for the administrative expenses and for taxes and for some profit, that therefore, you can tax that because it's no longer federal funds. Something like that. Yes, Your Honor, we're just saying that this is outside of this arrangement. We don't even get to this arrangement. These companies are doing business inside of South Carolina. They're selling property insurance. They're selling car insurance. They're selling flood insurance. Rob Tyson goes down to get a policy. I go to the Hartford office. I get a policy. They pay all that stuff. They don't pay it on this one. They don't pay it on the flood insurance. They don't pay it on the flood insurance. And our point is that it's exactly the same. The homeowner, the policy owner, he believes he's bought an insurance policy from Hartford. And as we've said, and just quickly on this letter, you know, two parts to that, too. One, we don't believe that this is, you know, it's a FEMA memo. It's not a regulation. It hasn't been vetted. Should we ignore it? No, sir, you shouldn't ignore it, but I don't think you should read it so broadly to say that that's congressional. I'm not reading it broadly. I'm reading it directly. But the question is should we give it any deference? You mean don't ignore it but don't read it? That's what you mean? Well, what I mean is, Your Honor, is I think that it's consistent with FEMA's position in the arrangement and that as you deal with reimbursement of expenses, what's allowed, what should be included, what companies should pay, what they shouldn't pay, whether somebody sues them over here, somebody sues them over there, all of those things go within the arrangement. This does not go within the arrangement. This is a company doing business inside our cities. They're getting money. They're collecting income. We don't care whether it comes from the gross premiums, whether it comes from the money. What if they're collecting internal revenue income? Do you want to tax that, too? No, sir. We don't want to do that. Well, that's the position you're taking. You're saying because they're doing business in your city, whatever premiums they collect you can tax, even though they may be federal funds. No, in that situation, if they are federal funds and there's a clear expression in the regulation, if there's a clear expression in the statute that says that, then, Your Honor, then we do run into that problem. There's a certain homespun appeal to your position, at least from my perspective. Thank you. You know, they're making money, and they ought to ante up, except the money they're making is being passed on to them by the federal government, and it's federal government money is what one view of the record says. The money that's being made is coming from me and you. It's coming from a homeowner who has a flood insurance policy. The only thing that's going to happen in this case, if you overturn Judge Perry's order, is they're going to make more money. These insurance companies, for the heart, for 2008, instead of making $8 million, Unless FEMA reduces the reimbursement to 25 percent. Now they're going to make less money. And if it comes down to 20 percent, they're going to make less money. But that's not in the record, Your Honor, and that's a good point. It's clear in the record. It's not on the expense allowance or all kinds of other factors. FEMA has unreviewable authority to set the reimbursement rate. You don't deny that. No, sir, I don't deny it, but it's based on a variety of factors, whether your electric bill went up, whether this happened, whether these taxes happened, whether Sandy came, whatever it might be. That's how they determine what their expense allowance is going to be annually. The South Carolina legislature could add another percent and a half to the state premium tax. How about 2 percent? 2 percent.  2 percent, 3 percent, and pass it through, like Judge Niemeyer's internet tax, right? They could do that next week. Maybe they could, but that's not what's before us right now. Don't publish that tax very far. Thank you, Your Honor. I appreciate you all letting me talk to you. All right. Okay. Ms. Sherry? What do you think about the idea of having the state of South Carolina have a supplement tax, a state premium tax of 2 percent? They could do that, couldn't they? They could, Your Honor, but I hope they will not. The municipalities need money, too. Every government is starved for money, and the person that's being squeezed out the most is the most localized government. Yes, Your Honor. That might be the best government. But that issue, Your Honor, actually is at the very heart of federal preemption analysis. It truly is a balancing of policy concerns. And while there may be some impact on the municipality, there is a very real impact on the federal government and the very purpose behind the National Flood Insurance Program itself. And that was the point that FEMA was making, Your Honor, in its statement of interest below when it acknowledged the very economic reality that if, in fact, this particular municipal license fee or tax is permitted, that it necessarily would result in an increase in the expense allowance because FEMA has taken a look and tried to maintain a delicate balance between the amount of the expense allowance that will encourage these WIO companies to actually issue these flood insurance policies on behalf of the government, Your Honor. And that's uniform all over the country, correct? Yes, Your Honor. The expense allowance? Yes. Your Honor, if I may just briefly also, I wanted to highlight we've been focusing on the language from the arrangement that is at issue. And, in fact, to address MASC's concerns, there is a scope of the preemption set forth in the language itself. It says the WIO companies are not liable for these other taxes or fees in the performance of its obligations under the arrangement. And that is exactly what the WIOs are doing in issuing these flood insurance policies. There was a reference by MASC that FEMA doesn't have the authority to tell the WIOs not to pay this tax. But, indeed, FEMA does. As the United States Supreme Court has noted in the Auer case, the Chase v. McCoy case in 2011, an agency's interpretations of its own regulations has controlling deference unless it's arbitrary. And, in this case, this is not an arbitrary interpretation of this arrangement, the regulations that were here before. Do you like the preemption analysis better than the sovereign immunity analysis? I like them both equally, Your Honor. But I feel like I'm choosing between two children. But I don't think there is a need to… Which children is stronger? I think the federal preemption, Your Honor. I don't think there's any need to get to the sovereign immunity. Is Rule 19 a foster child here? Red-headed stepchild, maybe. But, interestingly enough, all of these issues and arguments, I think, are intimately related. And when we were preparing for argument, we sometimes felt like we were going in a circle because it's hard to address the preemption argument without inevitably getting to the fact that these are federal funds, which leads to the sovereign immunity argument, which leads us to the FEMA memorandum, which leads us to our Rule 19b argument. So, to some extent, they are all related. But you don't need to get to sovereign immunity or Rule 19b. Well, why wouldn't it come first if they are federal funds? Why wouldn't the 19b come first? Why wouldn't this immunity be first? In other words, if they are, in fact, the premiums are federal funds, I haven't quite followed through the argument why they might not be. And I do want to look that further in view of the arguments of the municipalities. But if they are federal funds, then it seems to me you're not talking about preemption, which is sort of a weak sister. You're talking about you just can't tax federal funds. You can't go tax the Federal Reserve Bank or anything else. I mean, this is just the nature of the federal government. It's its property. But maybe that's an overreach in calling them federal funds. Your Honor, I don't think it is. And the Fourth Circuit did recognize in studio frames and actually in the battle case prior to that that the flood premiums are federal funds. And I'll go back to my original statement that I like both arguments equally. I will note, Your Honor, that FEMA's position in its statement of interest, they started first with their argument of sovereign immunity, that these are federal funds. And the FEMA memorandum from May of 2008 actually highlights that point as well. So I think it is somewhat challenging. Let me ask you a question that's maybe not on the table, but maybe it is. Does the expense structure of reimbursement to the insurance companies include profit? Your Honor, I believe that the regulations and the history established that there is designed an element to encourage the WIOs. So they get a little more than their actual payout expenses? I think that is part of the calculation, Your Honor, if I am correct. How could the municipalities tax that? Your Honor, no. Not under the sovereign immunity principles because the expense allowance isn't separate and above the federal flood premium. It's a remission to the insurance company. But when the funds come in, they are federal funds, the premiums themselves. They're given back to the insurance company. But that is... But they're not premiums then, right? Correct, Your Honor. Is that your answer? It's income, but it's not premium. But at that point, that is being done at the will or pleasure, if you will, Your Honor, of the federal government. That doesn't get you escape. I think the observation that it's income as opposed to a premium tax would answer that question because income can be taxed by the municipality. And maybe that would have to be included. Theoretically, Your Honor, but the issue before the court today is the fact that these taxes are being calculated on the premiums themselves as opposed to a profit margin that there may or may not be, Your Honor. Okay, thank you. All right, has everybody had a chance? We'll come down to Greek Council and proceed on the next case.
judges: Paul V. Niemeyer, Roger L. Gregory, Andre M. Davis